PD-0984-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/30/2015 4:24:57 PM
Accepted 7/30/2015 4:56:47 PM
ABEL ACOSTA
CLERK

No. 08-13-00334-CR

TO THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

WENDEE LONG,                                                            Appellant

v.

THE STATE OF TEXAS,                                                    Appellee

Appeal from Denton County

\* \* \* \* \*

**STATE'S PETITION FOR DISCRETIONARY REVIEW**

FILED IN
COURT OF CRIMINAL APPEALS

\* \* \* \* \*

July 30, 2015

ABEL ACOSTA, CLERK

LISA C. McMINN
State Prosecuting Attorney
Bar I.D. No. 13803300

JOHN R. MESSINGER
Assistant State Prosecuting Attorney
Bar I.D. No. 24053705

P.O. Box 13046
Austin, Texas 78711
information@spa.texas.gov
512/463-1660 (Telephone)
512/463-5724 (Fax)

## NAMES OF ALL PARTIES TO THE TRIAL COURT'S JUDGMENT

*The parties to the trial court's judgment are the State of Texas and Appellant, Wendee Long.

*The case was tried before the Honorable Margaret Barnes, 367th District Court, Denton County.

*Counsel for Appellant at trial was Barry Sorrels and Stephanie A. Luce, 2311 Cedar Springs, Suite 250, Dallas, Texas 75201.

*Counsel for Appellant on appeal was Bruce Anton and Brett E. Ordiway, 2311 Cedar Springs, Suite 250, Dallas, Texas 75201.

*Counsel for the State at trial was Matthew J. Shovlin and Lindsey E. Sheguit, Denton County Assistant District Attorneys, 1450 E. McKinney Street, Suite 3100 Denton, Texas 76209.

*Counsel for the State on appeal was Charles E. Orbison and Andrea R. Simmons, Denton County Assistant District Attorneys, 1450 E. McKinney Street, Suite 3100 Denton, Texas 76209.

*Counsel for the State before this Court is John R. Messinger, Assistant State Prosecuting Attorney, P.O. Box 13046, Austin, Texas 78711.

# TABLE OF CONTENTS

INDEX OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

GROUNDS FOR REVIEW.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

> **1.** **Does Penal Code section 16.02 prohibit intercepting and disclosing the contents of an oral communication even when the speaker has no expectation that his words will not be repeated by those present?**
>
> **2.** **Does a basketball coach have a justifiable expectation that his pep talk in a girls' locker room will not be secretly recorded by a former player?**

ARGUMENT AND AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PRAYER FOR RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

APPENDIX (Opinion of the Court of Appeals, Bill Analysis)

# INDEX OF AUTHORITIES

**Cases**

*State v. Betts*, 397 S.W.3d 198 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . . . . . . . . 3

*Bianco v. American Broadcasting Cos.*, 470 F. Supp. 182 (N.D. Ill. 1979). . . . . . 6

*Boddie v. American Broadcasting Cos.*, 731 F.2d 333 (6th Cir. Ohio 1984). . . 5-6

*Boykin v. State*, 818 S.W.2d 782 (Tex. Crim. App. 1991). . . . . . . . . . . . . . . . . . . . 4

*Chambless v. State*, 411 S.W.3d 498 (Tex. Crim. App. 2013). . . . . . . . . . . . . . . . . 4

*State v. Duchow*, 749 N.W.2d 913 (Wis. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*United States v. Faulkner*, 439 F.3d 1221 (10th Cir. Kan. 2006) . . . . . . . . . . . . . 6

*Jackson v. Virginia*, 443 U.S. 307 (1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Katz v. United States*, 389 U.S. 347 (1967). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Long v. State*, __S.W.3d__, 2015 Tex. App. LEXIS 6714
    (Tex. App.–El Paso 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Lopez v. United States*, 373 U.S. 427 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Maden v. State*, 07-11-0110-CR, 2013 Tex. App. LEXIS 2619
    (Tex. App.–Amarillo Mar. 13, 2013, pet. ref'd). . . . . . . . . . . . . . . . . . . . . . . 6

*McDuff v. State*, 939 S.W.2d 607 (Tex. Crim. App. 1997). . . . . . . . . . . . . . . . . . . 8

*State v. Scheineman*, 77 S.W.3d 810 (Tex. Crim. App. 2002). . . . . . . . . . . . . . . . 2

*United States v. Willoughby*, 860 F.2d 15 (2d Cir. N.Y. 1988). . . . . . . . . . . . . . . . 6

**Statutes and Rules**

TEX. CODE CRIM. PROC. art. 18.20 §1(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. CODE CRIM. PROC. art. 18.20 §1(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. PENAL CODE § 16.02(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. PENAL CODE § 16.02(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. PENAL CODE § 16.02(c)(4)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

18 USCS § 2510 (2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**<u>Other resources</u>**
S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2178. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

No. 08-13-00334-CR

TO THE COURT OF CRIMINAL APPEALS

OF THE STATE OF TEXAS

WENDEE LONG,                                                    Appellant

v.

THE STATE OF TEXAS,                                            Appellee


\* \* \* \* \*

**STATE'S PETITION FOR DISCRETIONARY REVIEW**

\* \* \* \* \*

TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Comes now the State of Texas, by and through its State Prosecuting Attorney, and respectfully urges this Court to grant discretionary review of the above named cause, pursuant to the rules of appellate procedure.

**STATEMENT REGARDING ORAL ARGUMENT**

The State requests oral argument. The statue prohibiting the interception and disclosure of oral communications has increasing relevance as recording technology becomes both more advanced and more accessible, including on most cellular phones. Conversation will help the Court decide the important privacy issues presented in this

1

case of first impression.[1]

## STATEMENT OF THE CASE

Appellant was convicted of the unlawful interception or disclosure of oral communications and sentenced to five years in prison, probated for three years, and fined $1,000.[2] The court of appeals held that the victim's words were not "oral communications" and rendered a judgment of acquittal.

## STATEMENT OF PROCEDURAL HISTORY

On June 30, 2015, the court of appeals reversed appellant's conviction and rendered a judgment of acquittal in a published opinion.[3] No motion for rehearing was filed. The State's petition is due on July 30, 2015.

## GROUNDS FOR REVIEW

1. **Does Penal Code section 16.02 prohibit intercepting and disclosing the contents of an oral communication even when the speaker has no expectation that his words will not be repeated by those present?**

2. **Does a basketball coach have a justifiable expectation that his pep talk in a girls' locker room will not be secretly recorded by a former player?**

---

[1] In *State v. Scheineman*, this Court reviewed the suppression of a recorded jail conversation that the defendant claimed violated both the Fourth Amendment and section 16.02, but neither this nor the lower court addressed the statutory claim. 77 S.W.3d 810, 811 (Tex. Crim. App. 2002).

[2] The State does not have access to the record. All facts are taken from the opinion of the court of appeals.

[3] *Long v. State*, __S.W.3d__, 2015 Tex. App. LEXIS 6714 (Tex. App.–El Paso 2015).

## ARGUMENT AND AUTHORITIES

Section 16.02 of the Penal Code prohibits intercepting and disclosing the contents of an oral communication.[4] An "oral communication" is one "uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation."[5] "'Intercept' means the aural or other acquisition of the contents of a wire, oral, or electronic communication through the use of an electronic, mechanical, or other device."[6] Does a basketball coach giving a pep talk to his team in a locker room have a justifiable expectation that his words will not be surreptitiously recorded by a cell phone hidden by a former player?

The court of appeals held he does not. It based its reversal on the traditional Fourth Amendment two-step analysis for legitimate expectation of privacy: 1) did the coach exhibit a subjective expectation of privacy, and 2) would society deem that expectation reasonable?[7] This approach was based on the near identity between the

---

[4] TEX. PENAL CODE § 16.02(b) ("A person commits an offense if the person: (1) intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication[ or] (2) intentionally discloses or endeavors to disclose to another person the contents of a wire, oral, or electronic communication if the person knows or has reason to know the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection[.]").

[5] TEX. PENAL CODE § 16.02(a) ("intercept" and "oral communication" have the meanings given those terms in Article 18.20, Code of Criminal Procedure); TEX. CODE CRIM. PROC. art. 18.20 §1(2).

[6] TEX. CODE CRIM. PROC. art. 18.20 §1(3).

[7] Slip op. at 6; *see State v. Betts*, 397 S.W.3d 198, 203 (Tex. Crim. App. 2013) (characterizing this as the standing requirement for Fourth Amendment complaints).

definition of "oral communication" and the corresponding federal Wiretap Act provision,[8] and the legislative history of the federal act suggesting that the statute was in response to *Katz v. United States*.[9] This is, by far, the prevailing view of the federal analogue.[10] But it is not supported by the plain language of section 16.02 and is bad policy.

<u>The court of appeals ignored the plain language of the statute</u>

"The best evidence of the Legislature's intent is the plain language of the law it passed."[11] Moreover, "the Legislature is constitutionally entitled to expect that the Judiciary will faithfully follow the specific text that was adopted."[12] Only if the plain language of a statute would lead to absurd results, or if the language is not plain but ambiguous, may a court consider such extratextual factors as legislative history.[13]

Section 16.02 does not broadly make it illegal to violate reasonable expectations of privacy. It does not even mention "privacy." It prohibits 1)

---

[8]    18 USCS § 2510 (2).

[9]    389 U.S. 347 (1967) (tapping a phone booth requires a warrant). *See* S.Rep. No. 1097, 90th Cong., 2d Sess. (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2178.

[10]    *See State v. Duchow*, 749 N.W.2d 913, 917-19 (Wis. 2008) (discussing the two views when interpreting its own statute patterned after the Wiretap Act).

[11]    *Chambless v. State*, 411 S.W.3d 498, 503-04 (Tex. Crim. App. 2013).

[12]    *Boykin v. State*, 818 S.W.2d 782, 785 (Tex. Crim. App. 1991).

[13]    *Id*. at 785-86. As it happens, the Texas Legislature read the legislative history of the federal Wiretap Act to "clearly indicate[] that Congress intended to permit state electronic surveillance laws to be more restrictive that the Federal Act, and therefore more protective of individual privacy . . . ." *See* Appendix (Bill Analysis for H.B. 360, 67th Leg., p.1).

intercepting, by electronic means, oral statements that the speaker justifiably expects not to be acquired, and 2) disclosing the contents of same. A federal case involving Geraldo Rivera illustrates the difference.

In *Boddie v. American Broadcasting Cos.*,[14] ABC ran a report produced by Rivera for "20/20" exposing a judge who allegedly traded leniency for sex.[15] Boddie, an alleged participant, sued when she discovered she was secretly filmed when interviewed.[16] ABC argued that the interview was not protected under the federal wiretap statute because Boddie had no expectation of privacy.[17] The court of appeals disagreed with that approach. "The record shows that Boddie was aware that she was speaking with reporters from ABC. But it remains an issue of fact for the jury whether Boddie had an expectation that the interview was not being recorded and whether that expectation was justified under the circumstances."[18] Citing another federal case against ABC, it noted:

> the statute requires that the plaintiff show only no expectation that the oral communication was being intercepted through the use of electronic devices. Thus, there "may be some circumstances where a person does not have an expectation of total privacy, but still would be protected by the statute because

---

[14]   731 F.2d 333 (6th Cir. Ohio 1984).

[15]   *Id*. at 335.

[16]   *Id*.

[17]   *Id*. at 338.

[18]   *Id*. at 338-39.

he was not aware of the specific nature of another's invasion of his privacy."[19]

The two interests undoubtedly often overlap. For example, a prisoner who is told that his phone call will be recorded has no reasonable expectation of privacy in its contents nor justifiable expectation that it will not be recorded.[20] But they are not co-extensive. This case is a good example.

Appellant's daughter had been on the team the victim coached but quit after the first game. During an away game for the district title, appellant's daughter entered the visitor's locker room and hid her iPhone inside a locker to record the coach's half-time and post-game speeches. The plan was to expose how mean he was to players. Appellant provided the recordings to the school board, and was arrested after the superintendent turned them over to police.

The court of appeals concluded that the coach's words were not "oral

---

[19] *Id*. at 339 n.5 (quoting *Bianco v. American Broadcasting Cos.*, 470 F. Supp. 182, 185 (N.D. Ill. 1979)). Or, as one court of appeals characterized it: "Appellant argues on appeal that the recording of his telephone conversation violated a provision of the Texas wiretapping statute. *The State briefs a different issue*, contending appellant had no reasonable expectation of privacy in his telephone call, under the Fourth Amendment." *Maden v. State*, 07-11-0110-CR, 2013 Tex. App. LEXIS 2619 at *3 (Tex. App.–Amarillo Mar. 13, 2013, pet. ref'd) (not designated for publication) (emphasis added) (the merits were not reached due to lack of preservation).

[20] *See United States v. Willoughby*, 860 F.2d 15, 23 (2d Cir. N.Y. 1988) ("Quintin and Montgomery conversed while Quintin was in the process of using the telephone to make another call, and they knew the telephones were linked to a recording system. . . . We doubt that in all the circumstances Quintin and Montgomery had a subjective belief that they could not be overheard, and we conclude that even if they did have such a belief, the circumstances did not justify it."); *cf. United States v. Faulkner*, 439 F.3d 1221, 1224 (10th Cir. Kan. 2006) ("It is generally accepted that a prisoner who places a call from an institutional phone with knowledge that the call is subject to being recorded has impliedly consented to the recording.").

communications" because "[he] was well aware that his communications to his players were subject to public dissemination"[21] and so "did not have [a] justifiable expectation that only they would acquire the contents of his communications."[22] The court's analysis makes sense only if the goal of the statute is to prevent disclosure by parties to private conversations. It is not. In fact, it is an affirmative defense that the person was a party to the communication.[23] Rather, the focus is the interception and disclosure by those not invited to the party who acquire the conversations without permission.

The State does not argue that the coach had a justifiable expectation that nothing he said would be repeated by any of the girls on the team. The question is whether anyone there could justifiably expect that their words, spoken in a closed locker room during a strategy session, would not be secretly recorded by someone who would not have been allowed in. Regardless of whether coaches are teachers, or whether teachers should have any right to exclude cameras from their classrooms,[24] the difference between the announced videotaping of teachers for performance reviews and a recording device hidden by a student in a locker room at a different

---

[21]    Slip op. at 11.

[22]    Slip op. at 15.

[23]    TEX. PENAL CODE § 16.02(c)(4)(A).

[24]    *See* slip op. at 6-10.

7

school is obvious.

The court of appeals substituted its judgment for that of the jury

The court of appeals's approach is also worrisome in that it rendered a judgment of acquittal while avoiding any reliance on sufficiency law. Appellant challenged the sufficiency of the evidence and the trial court's overruling of her motions for directed verdict, acquittal, and new trial, all based on the coach's supposed lack of justifiable expectation.[25] The court of appeals only addressed the directed verdict and acquittal; it explicitly did not address sufficiency.[26] This should not have been possible, as "a complaint about overruling a motion for directed/instructed verdict is in actuality an attack upon the sufficiency of evidence to sustain the conviction."[27] Yet, the court reviewed the issue as a question of law[28] without any reference to *Jackson v. Virginia*,[29] the reasonable doubt standard, or what a rational jury was entitled to do.

Conclusion

The difference between the privacy analysis espoused by the court of appeals

---

[25]   Slip op. at 4; *see* App. Br. at 3 (Table of Contents).

[26]   Slip op. at 15 ("Long's first and third issues are sustained. Given our disposition of these issues, we need not address her remaining issues.").

[27]   *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997).

[28]   Slip op. at 4-5.

[29]   443 U.S. 307 (1979).

8

and the plain language of the statute matters. In court, there is a qualitative difference between testifying to a person's statements and playing a recording of them, including reliability[30] and the power of hearing it in the speaker's own voice. Outside of a courtroom, it is the difference between someone claiming you said something and video of it being posted on YouTube or sent to TMZ. The legislature has the prerogative to stop the latter even when it cannot prevent the former.

The victim in this case expected not to have his private locker room speech secretly recorded by absent, excluded parties. A rational jury could have found this expectation was justified. The court of appeals was wrong to ignore the plain language of the statute and substitute its judgment for that of the jury.

---

[30]    *See Lopez v. United States*, 373 U.S. 427 (1963), in which the Supreme Court rejected his Fourth Amendment challenge the admissibility of a recording of his conversation with Davis, the IRS agent he attempted to bribe. *Id*. at 428-29. The government, *i.e.*, Davis, did not use the electronic device "to listen in on conversations it could not otherwise have heard." *Id*. at 439. "Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose." *Id*.

# PRAYER FOR RELIEF

WHEREFORE, the State of Texas prays that the Court of Criminal Appeals grant this Petition for Discretionary Review and reverse the decision of the Court of Appeals.

Respectfully submitted,

LISA C. McMINN
State Prosecuting Attorney
Bar I.D. No. 13803300

   /s/ John R. Messinger
JOHN R. MESSINGER
Assistant State Prosecuting Attorney

P.O. Box 13046
Austin, Texas 78711
John.Messinger@SPA.Texas.gov
512/463-1660 (Telephone)
512/463-5724 (Fax)

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that according to the WordPerfect word count tool this document contains 3,021 words.

/s/ John R. Messinger
JOHN R. MESSINGER
Assistant State Prosecuting Attorney

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 30th day of July, 2015, the State's Petition for Discretionary Review was served electronically through the electronic filing manager or e-mail on the parties below.

Andrea R. Simmons
1450 East McKinney
Denton, Texas 76209
Andrea.Simmons@dentoncounty.com

Bruce Anton
Brett E. Ordiway
2311 Cedar Springs, Suite 250
Dallas, Texas 75201
ba@sualaw.com
bordiway@sualaw.com

/s/ John R. Messinger
JOHN R. MESSINGER
Assistant State Prosecuting Attorney

**APPENDIX**



| | | |
|---|---|---|
| WENDEE LONG, | § | No. 08-13-00334-CR |
| | § | |
| Appellant, | § | Appeal from the |
| | § | |
| v. | § | 367th Judicial District Court |
| | § | |
| THE STATE OF TEXAS, | § | of Denton County, Texas |
| | § | |
| Appellee. | § | (TC# F-2013-1478-E) |
| | § | |

## O P I N I O N

The issue in this case of first impression is whether the following incidents constitute crimes under Texas's criminal wiretap statute: the surreptitious recording—later disclosed to a third party—of a public high school basketball coach's half-time and post-game speeches to his team in the visiting locker room of a public high school. In essence, a person violates the wiretap statute by intentionally recording, or intentionally disclosing the contents of, a "wire, oral, or electronic communication." *See* TEX.PENAL CODE ANN. § 16.02(b)(1), (b)(2)(West Supp. 2014). For purposes of the wiretap statute, an "oral communication" is one "uttered by a person *exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation*." [Emphasis added]. *See* TEX.PENAL CODE ANN. § 16.02(a); TEX.CODE CRIM.PROC.ANN. art. 18.20, § 1(2)(West 2015). The threshold question, as framed by

the parties, is whether the coach had a *reasonable expectation of privacy under the circumstances*. We conclude that he did not and, therefore, that the recordings in dispute are not "oral communications" covered by Section 16.02 of the Texas Penal Code, the statute used to convict Wendee Long. Accordingly, we reverse Long's conviction and render judgment acquitting her of the charged offense.

## FACTUAL AND PROCEDURAL BACKGROUND

Lelon "Skip" Townsend was hired in 2011 to coach the Argyle High School girls' basketball team. Townsend was, in his own words, an intense coach, who preached discipline and accountability. Not surprisingly, reports of Townsend berating and belittling players in practice began surfacing the following school year. Long, a member of the Argyle School Board, was concerned about the reports, and she grew increasingly concerned when parents began contacting her to complain of Townsend's treatment of their children. Long's daughter had also been a member of the basketball team before quitting after the first regular season game.

On February 7, 2012, the Argyle High School girls' basketball team traveled to Sanger to play the Sanger High School girls' basketball team for the district title. Long's daughter attended the game as a spectator and, with the assistance of a Sanger student, obtained access to the visiting locker room before halftime for the purpose of surreptitiously videotaping Townsend. Long's daughter taped an iPhone to the inside of a locker and set it to record. The iPhone captured an audio and video recording of Townsend's half-time speech[1] and an audio recording of

---

[1] Townsend's half-time speech was nine minutes in length. However, the recording introduced into evidence at trial depicted only the last two minutes. It appears that Long's daughter accidentally erased the first seven minutes of Townsend's half-time speech when she attempted to email the recording after retrieving the iPhone from the locker. Dissatisfied with the recording of the half-time speech, her daughter went back into the locker room "to get the end of game speech."

2

Townsend's post-game speech[2].

In March 2012, Long showed the recordings, which were on her computer at work, to her assistant principal.[3]   Later that month, Long mailed the recordings to the other members of Argyle School Board, and the recordings were distributed to the Board on the night of the meeting to consider Townsend's probationary contract.   A few days later, the Superintendent of the Argyle Independent School District turned over the recordings to the police.   A detective with the Sanger Police Department eventually traced the recordings to Long and her daughter.

Long was charged in a two-count indictment with, *inter alia*, violating Sections 16.02(b)(1) and (b)(2) of the Texas Penal Code.[4]   Section 16.02(b)(1) provides that a person commits an offense if she:   "intentionally intercepts, endeavors to intercept, or procures another person to intercept or endeavor to intercept a wire, oral, or electronic communication." TEX.PENAL CODE ANN. § 16.02(b)(1).   Section 16.02(b)(2) makes it a crime to:   "intentionally disclose[] or endeavor[] to disclose to another person the contents of a wire, oral, or electronic communication if the person knows or has reason to know the information was obtained through the interception of a wire, oral, or electronic communication in violating of . . . [Subsection (b)]." TEX. PENAL CODE ANN. § 16.02(b)(2).

The State alleged Long violated Section 16.02(b)(1) by procuring her daughter to record Townsend's speeches and Section 16.02(b)(2) by showing the recording to her assistant principal.

---

[2] Because the iPhone fell inside the locker room sometime after Townsend's half-time speech but before his post-game speech, it was unable to capture an audio/visual recording of the post-game speech.   Only the audio portion of the speech was recorded.

[3] Long was the principal of Wayside Middle School in Saginaw, Texas.

[4] Long was also charged with, and tried for, improper photography or visual recording under Section 21.15 of the Texas Penal Code.   *See* TEX.PENAL CODE ANN. § 21.15(b)(West 2011).   The jury, however, found her not guilty on that count.

3

The jury agreed, finding Long guilty. In accordance with the parties' plea-bargain agreement, the trial court sentenced Long to five years' confinement, probated for three years, and assessed a $1,000.00 fine.

On appeal, Long raises four issues for our review. In her second issue, she challenges the sufficiency of the evidence to sustain her conviction. In her first, third, and fourth issues, respectively, she asserts that the trial court erred in overruling her motions for directed verdict, for judgment of acquittal, and for a new trial. Although Long enumerates four issues, all rest on the premise that she committed no crime because, as a matter of law, Townsend "had no justifiable expectation that only his students would acquire the contents of his communication."

**REASONABLE EXPECTATION OF PRIVACY UNDER THE CIRCUMSTANCES**

As mentioned in the preceding paragraph, Long moved for a directed verdict at trial and for a judgment of acquittal after trial. The basis for both motions was the argument that Townsend had no reasonable expectation of privacy, nor a justifiable expectation that his communication was not subject to interception, because his lecture to the team was public speech, which is subject to lawful recording regardless of where it occurs. In her appellate briefing, Long contends that the trial court erred in overruling her motions for directed verdict and for judgment of acquittal because, under the circumstances, Townsend had no reasonable expectation that his intercepted communication was private. We agree.

### *Standard of Review*

Both parties acknowledge that a trial court's ruling on a motion for directed verdict or judgment of acquittal based on a question of law is subject to *de novo* review on appeal. *See Graham v. Atl. Richfield Co.*, 848 S.W.2d 747, 750 (Tex.App.--Corpus Christi 1993, writ

4

denied)(*de novo* review is the proper standard to be employed by an appellate court in reviewing a trial court's directed verdict based on non-evidentiary grounds); *Johnson v. State*, 954 S.W.2d 770, 771 (Tex.Crim.App. 1997)(question of law are subject to *de novo* review). A directed verdict is proper when the law applied to the undisputed facts mandates a particular result. *Graham*, 848 S.W.2d at 750. Here, the question of law is whether Townsend had a reasonable expectation of privacy in his speeches. To answer that question, we turn to the concept of privacy espoused in federal law.

### *Applicable Law*

It is beyond dispute that the Texas criminal wiretap statute, Section 16.02, is substantially similar to the federal one on which it is modeled, the Wiretap Act, codified as 18 U.S.C. §§ 2510-2521.[5] *See Alameda v. State*, 235 S.W.3d 218, 220, 222 (Tex.Crim.App.), *cert. denied*, 552 U.S. 1029, 128 S.Ct. 629, 169 L.Ed.2d 406 (2007)(recognizing similarity); *Meyer v. State*, 78 S.W.3d 505, 509 (Tex.App.--Austin 2002, pet. ref'd)(same). Indeed, the respective definitions of "oral communication" in both statutes are comparable. *Compare* 18 U.S.C. § 2510(2)(defining "oral communication" as "any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation, but such term does not include any electronic communication."), *with* TEX.CODE CRIM.PROC.ANN. art. 18.20, § 1(2)(defining "oral communication" as "any oral communication

---

[5] The Wiretap Act was enacted in 1968 as Title III of The Omnibus Crime Control and Safe Streets Act of 1968. Pub.L. 90-351. In 1986, it was amended by the Electronic Communications Privacy Act of 1986 (hereinafter, the "ECPA") to include electronic communication as well as oral and written communications. *See generally* Act of October 21, 1986, Pub.L. No. 99-508, 100 Stat. 1848. In turn, the ECPA was amended by the following statutes: (1) the Communications Assistance for Law Enforcement Act—*see generally* Act of October 25, 1994, Pub.L. 103-414, 108 Stat. 4279—(2) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001—*see generally* Act of October 26, 2001, Pub.L. 107-56, 115 Stat. 272—(3) the USA PATRIOT Improvement and Reauthorization Act of 2005—*see generally* Act of March 9, 2006, Pub.L. 109-177, 120 Stat. 192—and (4) the FISA Amendments Act of 2008—*see generally* Act of July 10, 2008 Pub.L. 110-261, 122 Stat. 2436.

uttered by a person exhibiting an expectation that the communication is not subject to interception under circumstances justifying that expectation. The term does not include any electronic communication."). It is also beyond dispute that, in interpreting Section 16.02, we may rely on decisions from other state courts and federal courts construing the Wiretap Act. *See Alameda*, 235 S.W.3d at 18; *Meyer*, 78 S.W.3d at 509.

The legislative history of the Wiretap Act reveals that Congress's intent was to protect persons engaged in oral communications under circumstances justifying an expectation of privacy. *United States v. McIntyre*, 582 F.2d 1221, 1223 (9th Cir. 1978). Thus, to determine whether a person had a reasonable expectation of privacy in his speech, we employ a two-prong test: (1) did the person exhibit a subjective expectation of privacy; and (2), if so, is that subjective expectation one society is willing to recognize as reasonable. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex.Crim.App. 1996). That determination is made on a case-by-case basis and is highly fact determinative. Given the great variety of work environments in the public sector, the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis. *O'Connor v. Ortega*, 480 U.S. 709, 718, 107 S. Ct. 1492, 1498, 94 L. Ed. 2d 714 (1987).

## *Discussion*

Based on the application of existing authority to the evidence adduced at trial, we conclude that Townsend did not have a reasonable expectation of privacy in his half-time and post-game speeches to his players.

It is widely accepted that a public school teacher has no reasonable expectation of privacy in a classroom setting. *See Roberts v. Houston Indep. Sch. Dist.*, 788 S.W.2d 107

6

(Tex.App.--Houston [1st Dist.] 1990, writ denied); *Plock v. Bd. of Educ. of Freeport Sch. Dist. No. 145*, 545 F. Supp. 2d 755 (N.D. Ill. 2007); *Evens v. Super. Ct. of L.A. County*, 77 Cal.App.4th 320, 91 Cal.Rptr.2d 497 (1999).   In *Roberts*, the court held that a public school teacher had no legal complaint against a school district for audiotaping and videotaping her classroom performance because a teacher has no reasonable expectation of privacy while teaching in a public classroom. 788 S.W.2d at 111.   There, the school district's assessment team videotaped a teacher's classroom performance, with the teacher's knowledge but over her objection.   *Id.* at 108.   After reviewing the videotape, the assessment team recommended that the school district terminate the teacher for incompetence and inefficiency.   *Id.*   The school district notified the teacher of her impending termination.   *Id.* at 108-09.   The teacher contested the proposed termination, and the school board held a hearing and considered evidence, including excerpts from the videotapes.   *Id.* at 109. The teacher sued for invasion of privacy.   *Id.* at 109.   The court rejected her claim on the basis that she had not demonstrated "that she had a 'reasonable expectation of privacy' in her public classroom."   *Id.* at 111.   In reaching this conclusion, the court reasoned that "the activity of teaching in a public classroom does not fall within the expected zone of privacy" because "[t]here is no invasion of the right of privacy when one's movements are exposed to public views generally."   *Id.*   The court noted that the teacher "was videotaped in a public classroom, in full view of her students, faculty members, and administrators [and] [a]t no point, did the school district attempt to record [the teacher's] private affairs."   *Id.*

In *Plock*, the federal district court held that special education teachers could not enjoin the school district from installing audio/visual recording equipment in their classrooms because the teachers had no reasonable expectation of privacy in communications in their classrooms.   *Id.* at

758. There, the teachers claimed that the proposed audio monitoring of their classrooms through audio/visual equipment would violate their Fourth Amendment right to be free unreasonable searches and seizure. *Plock*, 545 F.Supp.2d at 756. The court rejected the teachers' claim on the basis that any expectation of privacy in communications taking place in classrooms that are open to the public was inherently unreasonable because the classrooms were not solely reserved for the teachers' exclusive, private use. *Id*. at 758. In reaching this conclusion, the court reasoned that communications in a public classroom are not private because "[w]hat is said and done in a public classroom is not merely liable to being overheard and repeated, but is likely to be overheard and repeated." *Id*. The court did acknowledge, however, that "a teacher's personal office space," including his or her desk and locked file cabinets, "could conceivably be reserved for the teacher's exclusive use, giving rise to an expectation of privacy which society is willing to recognize as reasonable." *Id.* at 757.

In *Evens*, the court held that California's privacy laws do not prohibit school officials from using an illegal videotape recording of a teacher in disciplinary actions because the privacy laws did not expressly prohibit that type of use and because the recording in issue was not the type of "confidential communication" protected by the privacy laws. 77 Cal.App.4th at 323-24, 91 Cal.Rptr.2d at 498-99. There, two students surreptitiously videotaped a public high school science teacher in her classroom and delivered it to the school board and district. *Id*. at 322, 91 Cal.Rptr.2d at 498. The teacher sought a judicial declaration that state statutes prohibited these entities from viewing the videotapes because evidence obtained as a result of unconsented recordings cannot be used in any administrative or judicial proceeding. *Id*. at 322-23, 91 Cal.Rptr.2d at 498-99. The court rejected the teacher's argument on the basis that the "videotape

8

recording . . . was made in a public classroom" and was therefore not considered a "confidential communication" because the teacher's expectation that her communications and activities would be private and confined solely to the classroom was unreasonable. *Evens*, 77 Cal.App.4th at 323-24, 91 Cal.Rptr.2d at 498-99. In reaching this conclusion, the court reasoned that a teacher's communications and activities in a public classroom are not private because:

> [They] will virtually never be confined to the classroom. Students will, and usually do, discuss a teacher's communications and activities with their parents, other students, other teachers, and administrators. . . . A teacher must always expect 'public dissemination' of his or her classroom 'communications and activities.'

*Id*. at 324, 91 Cal.Rptr.2d at 499.

While not as widely accepted as the proposition that a public school teacher has no reasonable expectation of privacy in a classroom setting, a public high school coach—like a public high school teacher—is an educator, in the broadest sense of the word. The essence of an educator's role is to prepare students to fulfill their role as responsible citizens in a free society. *Lowery v. Euverard*, 497 F.3d 584, 589 (6th Cir. 2007); *Hardy v. Jefferson Cmty. Coll.*, 260 F.3d 671, 679 (6th Cir. 2001). "Educating students includes not only classroom teaching, but also supervising and educating students in all aspects of the educational process." *Ex parte Trottman*, 965 So.2d 780, 783 (Ala. 2007). Extracurricular activities are important to many students as part of a complete educational experience. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 311, 120 S.Ct. 2266, 2280, 147 L.Ed.2d 295 (2000). To "educate" means "to train by formal instruction and supervised practice esp. in a skill, trade, or profession" or "to develop mentally, morally, or aesthetically esp. by instruction." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 396 (11th ed. 2009).

9

Although the duties of a coach are not comparable to that of the typical classroom teacher, no one could reasonably deny that some of the duties of a coach involve a type of teaching. *Theiler v. Ventura Cnty. Cmty. Coll. Dist.*, 198 Cal.App.4th 852, 859, 130 Cal.Rptr.3d 273, 277 (2011), *as modified* (Aug. 24, 2011). A public high school coach educates students-athletes in a myriad of ways. Principally, a coach provides instruction to help his players reach a certain performance standard in a chosen activity. *See Lowery*, 497 F.3d at 589 (recognizing that "the immediate goal of an athletic team is to win the game, and the coach determines how best to obtain that goal[]"); *Ex parte Nall,* 879 So.2d 541, 546 (Ala. 2003)(holding that student injured during baseball practice could not recover in negligence suit against public school coaches because they were state agents entitled to immunity for the exercise of judgment in *educating* students). Secondarily, a coach teaches his players to develop self-discipline, an admirable trait and one necessary for success in most endeavors in life, including academics. *See Lowery*, 497 F.3d at 589 (recognizing that students participating in sports develop discipline, and that "[a]thletic programs may also produce long-term benefits by distilling positive character traits in the players[]")*; Ex parte Yancey*, 8 So.3d 299, 305-06 (Ala. 2008)(holding that student injured while cleaning field house following weight-lifting class taught by high school public coach could not recover in negligence suit against the coach because he was a state agent entitled to immunity for the exercise of judgment in teaching students *discipline* in his weight-lifting class by requiring then to clean field-house facilities).

From the preceding authority, we can extrapolate that society is not willing to recognize that a public school educator—whether a teacher or a coach—has a reasonable expectation of privacy in his or her instructional communications and activities, regardless of where they occur,

10

because they are always subject to public dissemination and generally exposed to the public view.

Here, there is no doubt that Townsend was an educator helping his pupils maximize performance and develop discipline. At trial, Townsend acknowledged his role as an educator:

> [DEFENSE COUNSEL]: Even though it has a -- it can be a private dressing room during the times that you just described when the girls are changing clothes or going to the bathroom back in the bathroom part -- or it can be used as a space for you to be an educator; is that correct?
>
> [TOWNSEND]: Yes, sir.
>
> [DEFENSE COUNSEL]: I mean, it's a – it's a – it's a convenient space for you, who are supposed to be an educator, to meet with your -- the young ladies that are in a public school where you're a public teacher; is that right?
>
> [TOWNSEND]: That's correct.
>
> [DEFENSE COUNSEL]: It's a classroom basically; would you agree?
>
> [TOWNSEND]: Sometimes it is, yes.

Townsend also identified for the jury the lessons he strived to impart on his players:

> I expect my kids to work hard. I expect my kids to be disciplined. I want a disciplined team, which just means that I want the kids to play together, to do what the coaches ask them to do, to buy into what we're doing, and just play as hard as they can.
> And, you know -- and I know winning is important. I've never been in a gym that there wasn't a scoreboard up there, so I know winning's -- the score means something, but I -- one of my -- my style has always been this, is winning takes care of itself when you -- when you develop kids who have discipline, who are determined, have determination, they dedicate theirselves, and they have a good character.
> So we always try to do things that develop character in the kids and a good work ethic and accountability. Those are the things that we look for on a team. And something that's always been my trademark in any of my teams is we're – we're able to accomplish that, those things, whether winning or not.

Just as important, Townsend was well aware that his communications to his players were subject to public dissemination. In the audio recording of his speech to the team following the loss to

11

Sanger, Townsend can be heard telling the players:

> And you know, I know the deal. You go home and you tell your parents, 'Well, uh that's what they told me to do; I . . . screwed up but that's what they told me to do.' And that's easy to do coming from you to them, you know, when there's not me there to say, 'I don't believe that is what I told you to do.' It's kinda easy to do that, you know. If that, if that's how you live, that's that's – go ahead and live like that.

Accordingly, we conclude that society is not willing to recognize as reasonable any expectation of privacy in half-time and post-game instructional communications uttered by a public high school basketball coach to his team in the visiting locker room of a public high school.

The State takes umbrage with the proposition "that a coach addressing his team during and after a sports contest is 'equivalent' to a teacher addressing a class." The State asserts a "coach is different from a teacher" in two important respects. The first is that "[a] coach's objective is not pedagogical in nature, but rather to achieve success in the sports arena." The second is that "the nature of a coach's behavior with his team on game day" in a closed locker room is private rather than public. In essence, the State is contending that the curtailed expectation of privacy society is willing to recognize for teachers "should not automatically be applied to coaches addressing their teams at halftime or at the end of a sports contest" because a coach fulfills a different role in a different physical space. While we are not insensitive to the State's argument, we are not persuaded by it.

In support of its proposition that high school coaches are not akin to a high school teachers because high school coaches "do not contribute to a student's generalized knowledge base regarding educational requirements of a high school as do teachers of subjects such as science, math, or social studies[,]" the State cites *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995). The State's reliance on *Dambrot* is misplaced.

12

In *Dambrot*, the Sixth Circuit Court of Appeals held that the coach of a state university basketball team did not engage in protected speech when he used the word "nigger" during a locker-room peptalk. 55 F.3d at 1187. The court so held for a variety of reasons, including the rationale that the coach could not bring himself under the protection of academic freedom because he used the derogatory term to motivate rather than to educate. *Id.* at 1188-91. In making the point that the coach's speech was removed from any academic context, the court observed:

> Dambrot's use of the N-word is even further away from the marketplace of ideas and the concept of academic freedom because his position as coach is somewhat different from that of the average classroom teacher. Unlike the classroom teacher whose primary role is to guide students through the discussion and debate of various viewpoints in a particular discipline, Dambrot's role as a coach is to train his student athletes how to win on the court. The plays and strategies are seldom up for debate. Execution of the coach's will is paramount. Moreover, the coach controls who plays and for how long, placing a disincentive on any debate with the coach's ideas which might have taken place.

*Id*. at 1190.

But the court's observations in *Dambrot* are inapplicable in resolving this case. The issue here is whether Townsend had a reasonable expectation of privacy in his speeches. It is not, as it was in *Dambrot*, whether the contents of Townsend's speeches were protected under the First Amendment as matters of public concern. The two are distinct legal inquiries. Furthermore, the context in which sports and academics were distinguished in *Dambrot* is of no help here. The court merely illustrated the distinction between the two disciplines in relation to speech intended for a private rather than a public audience. Because the illustration does not explain why the distinction matters in any other context, it provides no guidance in answering the burning question: does a public high school coach have a reasonable expectation of privacy in half-time and post-game instructional communications to his team. *Dambrot* is thus inapposite.

13

In support of its proposition that coaches are not akin to teachers because "[,]in the context of a sports contest, a locker room is surely not a classroom, but a place for student athletes . . . to be reminded of the particular game plan and strategy for the game at hand, to consider how to improve performance at halftime of the game, and to hear an assessment of performance at the conclusion of the contest . . .[,]" the State cites *Borden v. Sch. Dist. of the Township of East Brunswick*, 523 F.3d 153 (3rd Cir. 2008), *cert denied*, 555 U.S. 1212, 129 S.Ct. 1524, 173 L.Ed.2d 656 (2009).   The State's reliance on *Borden* is misplaced.

In *Borden*, the Third Circuit Court of Appeals held that a public school football coach's twenty-three-year practice of "engag[ing] in the silent act [ ] of bowing his head during his team's pre-meal grace and taking a knee with his team during a locker-room prayer" constituted an unconstitutional endorsement of religion.   523 F.3d at 158, 176-78.   In reaching this holding, the court disposed of the coach's argument that his conduct was a "matter[] of public concern triggering protection of his rights, as a public employee, to freedom of speech" by highlighting the facts supporting its conclusion that the coach's speech was not public in nature:

> Borden's speech does not occur in any type of official proceeding, and even more importantly, Borden's speech does not extend into any type of public forum.   In fact, Borden himself admits that the bowing of his head and taking of a knee occur in private settings, namely at an invitation-only dinner and *in a closed locker room*. Again, we find further support for this decision in the Sixth Circuit's opinion in *Dambrot*, where the court noted the private nature of the coach's message to his players because the coach's pep talk was given *in a locker room for the private consumption of his players*.   55 F.3d at 1188.   Thus, we conclude that as in *Dambrot*, the bowing of Borden's head and taking a knee are meant for the *consumption of the football team only*.   [Emphasis added].

523 F.3d at 171.   The State directs our attention to the italicized portions of this passage.

But just as the court's observations in *Dambrot* are inapplicable in resolving this case, so too are the court's observations in *Borden*.   This is because *Dambrot* and *Borden* are of the same

14

ilk.  Thus, for the reasons articulated above, *Borden* is inapposite.  Furthermore, *Roberts*, *Plock*, and *Evans* make clear that an educator has no expectation of privacy in a space where he or she is providing instructional communications and activities to students.  Here, Townsend was providing instructional communications to his players.  That the instructional communications took place in a visiting locker room is inconsequential because the space was open to and occupied by student-athletes for the very purpose of receiving instruction.

Because society is not willing to recognize as reasonable any expectation of privacy in half-time and post-game instructional communications uttered by a public high school basketball coach to his players in the visiting locker room of a public high school, Townsend did not have justifiable expectation that only they would acquire the contents of his communications.  Consequently, the recordings in dispute are not "oral communications" covered by Section 16.02 of the Texas Penal Code.

Long's first and third issues are sustained.  Given our disposition of these issues, we need not address her remaining issues.  *See* TEX.R.APP.P. 47.1 (providing that the court of appeals must hand down a written opinion that is as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal).

## CONCLUSION

The trial court's judgment is reversed, and we render judgment acquitting Long of the charged offense.

June 30, 2015

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rodriguez, and Hughes, JJ.

(Publish)

15

BILL ANALYSIS

Background Information

In 1968 Congress passed Title III of the Omnibus Crime Control and Safe Streets Act which governs the use of electronic surveillance, i.e., wiretapping and bugging.

When Title III was enacted there were several conflicting views on any legislation regulating electronic surveillance. Those who felt that abuses were inherent in any use of electronic surveillance believed that a total ban on electronic surveillance was necessary for the protection of individual privacy. Advocates of strong law enforcement felt that a broad based statute was necessary with few limits in order to provide what they claimed to be a vital crime fighting tool.

Title III was enacted as a compromise of these opposing views. It permits the use of court-authorized electronic surveillance by law enforcement officers in the investigation of certain enumerated crimes under procedures designed to afford a degree of protection of individual privacy. Title III banned completely the use of electronic surveillance by private individuals without the consent of any of the parties to the conversation.

Under Title III, states must enact specific legislation if they desire to implement the authority granted in the Act to conduct electronic surveillance. The legislative history of Title III clearly indicates that Congress intended to permit state electronic surveillance laws to be more restrictive than the Federal Act, and therefore more protective of individual privacy, but state enactments cannot be less restrictive. Nor can they expand the use of electronic surveillance beyond the perimeters established by Title III.

There are presently 25 states and the District of Columbia which have electronic surveillance statutes. All of these statutes are patterned after the Federal Act.

What the Bill Proposes to Do

The bill creates new law by adding a new Article 18.20 to the Texas C.C.P. relating to the use of electronic surveillance as a law enforcement tool. The bill generally follows the provisions of Title III except for provisions which limit the use of electronic surveillance to narcotics cases, provisions for the designation of a judge from each administrative judicial district to rule on applications, provisions relating to applying authorities and provisions defining the role of the Texas Department of Public Safety as the only agency in implementing any electronic surveillance.

Section by Section Analysis

Section 1. Creates a new Article 18.20, T.C.C.P. with the following provisions:

   Sec. 1. Definition Section

   Sec. 2. Intercepted communications and evidence derived in violation of this Act shall be inadmissible in any legal proceeding.

   Sec. 3. Provides for the designation by the presiding judge of the Court of Criminal Appeals of one district judge from each administrative judicial district to hear applications for electronic surveillance within that district. If the designated judge is unable to act, then the designated judge from the adjacent district may act.

   Sec. 4. Provides that electronic surveillance may be authorized only for felony violations of the Controlled Substances Act or the Dangerous Drug Act. Possession of marijuana is excluded from the application of the bill.

   Sec. 5. Provides that the Texas Department of Public Safety be the primary agency relative to the possession, installation, operation or monitoring of any electronic surveillance device. The director of D.P.S. would be required to designate in writing those D.P.S. officers responsible for conducting the above operations. Other law enforcement officers would be allowed to assist D.P.S. only in the operation and monitoring of an electronic surveillance order.

Sec. 6 (a)  The Director of D.P.S. may request in writing for a prosecutor to apply for an order authorizing a wire or oral intercept.

(b)  Local law enforcement agencies may request a prosecutor to apply for a wire or oral intercept but only after the Director of D.P.S. has made certain findings in writing that such an intercept is proper.

Sec. 7 (a) (b) (c).  Provides for the disclosure and use of intercepted communications when said interceptions are made in accordance with this Act.

(d)  Under this section privileged communications retain their privileged character.

(e)  The section further provides for the use and disclosure of evidence of offenses other than those specified in the authorization order if the initial interception is found to be in accordance with the Act and a subsequent order is granted by the judge of competent jurisdiction.

Sec. 8 (a).  Provides that each application for interception authorization must be in writing and under oath and shall include:
   (1)  Identity of the applicants
   (2)  A full and complete statement of facts to justify a need for the order including details of the offense, a description of the place where the communication is to be seized, a description of the conversation, and the identity of the person, if known, whose communication is to be seized
   (3)  A full and complete statement of other procedures tried or if not tried why said procedures are unlikely to succeed or are dangerous
   (4)  A statement of the period of time for which the interception is required to be maintained
   (5)  A statement whether or not a covert entry is necessary and if so, the underlying facts why such an entry is required
   (6)  A full and complete statement of facts relative to prior applications
   (7)  Justification for any extension, if applicable.

(b)  The judge may also require ex parte additional testimony or evidence in support of an application; and such testimony or documentary evidence shall be preserved as part of the application.

Sec. 9 (a).  Provides that in order to approve an application the judge must find on the basis of the application that:
   (1)  There is probable cause for belief that an individual is committing, has committed, or is about to commit an offense enumerated in Sec. 4 (narcotics)
   (2)  There is probable cause to believe that communications concerning said offense will be obtained
   (3)  Normal investigative procedures have failed or appear unlikely to succeed or are too dangerous
   (4)  There is probable cause to believe that the facilities in question are actually being used by the target person listed in the application
   (5)  A covert entry is or is not necessary to properly and safely install the wiretapping or electronic surveillance or eavesdropping equipment.

(b)  Each order authorizing or approving the interception of any wire or oral communication shall specify:
   (1)  The identity of the person, if known, to be intercepted
   (2)  The nature and location of the facilities to be tapped
   (3)  A description of the type of communication to be intercepted and the offense to which it relates
   (4)  The identity of the authorized officer and prosecutor
   (5)  The time period of the authorization (and whether or not an extension might be needed)
   (6)  Whether or not a covert entry or surreptitious entry is necessary to properly and safely install wiretapping, electronic surveillance or eavesdropping equipment.

(c)  Upon request of the applicant the judge may order communication common carriers and other persons to provide certain assistance in implementing an order.  Compensation is provided for said services.

(d)  Every order and extension must contain a provision that the authorization to intercept shall be executed as soon as practicable along with a provision that the intercept be conducted in such a way as to minimize the interception of communications not otherwise subject to interception.  An extension may be granted after an application is made pursuant to Section 8 of this Article for a period of up to 30 days.  All orders and extensions must cease once the authorized objective is obtained or 30 days expire.

(e)  The judge may also require reports to be submitted showing what progress has been made.

Sec. 10 (a).  The recording of intercepted wire or oral communications is required under this section and shall be done in such a way as to protect the tapes from editing and alteration.

(b)  Provides procedures for the sealing, preservation and retention of recorded communications for a ten (10) year period after the intercept.  Custody of these communications by the judge is required and may only be destroyed upon the order of a judge of competent jurisdiction.  It is mandatory that the recordings be sealed.

(c)  Provisions are made for duplication of recordings.

(d)  The presence of the seal is a prerequisite for use or disclosure of the intercept unless a satisfactory explanation of its absence is shown.

Sec. 11.  Provides that the judge of competent jurisdiction shall seal each application made and order granted.  The application or order may be disclosed only by the judge of competent jurisdiction and may not be destroyed for at least 10 years and then only upon order of the judge of competent jurisdiction.

Sec. 12.  Provides for contempt penalty for violation of Sections 10 and 11.

Sec. 13 (a).  Provides for notice to intercepted parties not later than 90 days after the application is granted or denied.  The notice would essentially apprise the tapped party of the fact that his communications had been intercepted.

(b)  The judge could also allow inspection of recorded communications if he so chooses, in the interest of justice.

(c)  Notice may be delayed upon an exparte showing of good cause.

Sec. 14 (a).  Provides for at least 10 days notice of the interception application and order to all parties prior to the use of any communication as evidence.  This provision may be waived in some instances by the judge.

(b)  The section further provides for a hearing on a motion to suppress intercepted communications.  An aggrieved person may have intercepted communications suppressed as evidence if he shows that:
    (1)  the communication was unlawfully intercepted
    (2)  the order was insufficient
    (3)  the interception was not made in conformity with the order.

(c)  A person identified on a recording may move to suppress under subdivision (b) of this section or when his identification in court would cause harm to him exceeding the value of the identification to the prosecution.

(d)  A motion for suppression must be made before the trial and shall be in camera, if requested, and the judge may allow inspection of intercepted communications at his discretion.

Sec. 15.  Provides for the filing of detailed reports on each electronic surveillance order.  Reports contain particulars of all aspects of an order and are to be forwarded to the Administrative Office of the United States Courts.  Copies of all reports would be forwarded to the Governor, Lieutenant Governor, Speaker of the House and the Chairmen of the Senate and House committees having jurisdiction.

Sec. 16 (a)  Provides for recovery of civil damages for acts in violation of this Act:
    (1)  $100 per day or $1,000 whichever is higher, as liquidated damages
    (2)  punitive damages
    (3)  attorney's fees and costs.

(b)  A good faith reliance on a court order or legislative authorization constitutes a complete defense to any civil or criminal action brought under this Article.

Sec. 17. Provides exceptions to Section 16 for employees, officers or agents of a communication common carrier. Consensual recordings and interceptions are also excepted.

Section 2. Creates a new Section 16.02, Texas Penal Code with the following provisions:
- (a) Definitions
- (b) Provides a penal sanction for the interception and/or disclosure of wire or oral communications outside the scope of this Act.
- (c) Provides that it is an exception to the penal violation if the intercept is made by:
  - (1) Communications common carriers' employees in the normal course of their duties
  - (2) Communications common carriers' employees relative to a valid order
  - (3) Consensual surveillance.
- (d) Provides for third degree felony sanction for the manufacture, assembly, possession, sale, or delivery of devices designed primarily for non-consensual interception of wire or oral communications outside the scope of this Act.
- (e) Provides for certain exceptions to this offense.
- (f) Provides that this offense is a third degree felony.
- (g) Devices possessed in violation of this Article may be seized pursuant to a lawful search.
- (h) Forfeiture of seized devices to D.P.S. is provided.

Section 3. The title to Chapter 16, Texas Penal Code is amended to read:
CHAPTER 16. CRIMINAL INSTRUMENTS AND INTERCEPTION OF WIRE OR ORAL COMMUNICATION

Section 4. Provides that conviction of an offense under Section 16.02, Penal Code, shall disqualify a person seeking certification by the Commission on Law Enforcement Officers Standards and Education. Persons who are already certified shall have their certification revoked.

Section 5. Emergency Clause.

Rulemaking Authority

It is the committee's opinion that this bill does not delegate rulemaking authority to a state officer, agency, department or institution.

Summary of Committee Action:

The bill was presented in public hearing on February 25, 1981, and was referred to subcommittee. The subcommittee met on April 9, 1981. The bill was reported favorably from the full committee in formal meeting as substituted, on April 14, 1981, by a vote of 7 ayes, 3 nays, 0 present not voting, and 1 absent.

Comparison of Bill as Introduced and the Substitute:

The substitute contains language which requires that covert entry be provided for in the application and the court authorization. Covert entry is implicitly allowed in the original bill by virtue of case law.

The substitute provides that the Director of D.P.S. forward a report reflecting all completed orders to the Governor, Lieutenant Governor, Speaker of the House and the Chairmen of the House and Senate Committees having jurisdiction. Such reporting is not provided for in the original bill.

The substitute provides that D.P.S. personnel may be assisted by local law enforcement personnel only in the operation and monitoring of interceptions. The original bill did not limit assistance to only operation and monitoring.

The substitute provides that a person convicted of an offense of unlawful interception, use, or disclosure of wire or oral communication is disqualified from being commissioned as a peace officer. Conviction would cause an already commissioned officer to be decertified. The original bill contained no such provision.

Bill Analysis - H.B. 360
Page 5

The substitute provides that any additional testimony or documentary evidence
ordered by the judge must be preserved as part of the application. This provision
is not contained in the original bill.

The substitute provides that all intercepted persons must be notified as to said
interception. The original bill provided that the judge had discretion as to no-
tification.

The substitute provides that all interceptions must be recorded. The original bill
provided that a recording would be made, if possible.

The substitute provides that an intercepted person may move to suppress the contents
of a communication on the grounds that the harm resulting from his identification
in court exceeds the value to the prosecution of the disclosure of the contents.
This is a new provision.